**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**
**PHOENIX DIVISION**

_____
JAMES E. WHITESCARVER, on behalf of
himself and all others similarly situated,

                *Plaintiff*,

        v.

KONINKLIJKE PHILIPS N.V.;
PHILIPS NORTH AMERICA LLC;
PHILIPS RS NORTH AMERICA LLC;
PHILIPS HOLDING USA, INC.;
PHILIPS RS NORTH AMERICA
HOLDING CORPORATION; WM. T.
BURNETT & CO.; WM. T. BURNETT
HOLDING LLC; WM. T. BURNETT &
CO. INCORPORATED; WM. T.
BURNETT FIBER LLC; and WM. T.
BURNETT IP LLC,

             *Defendants*.
_____

Case No. _____

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

**COMPLAINT**

Plaintiff James E. Whitescarver ("Plaintiff" or "Plaintiff Hancock"), on behalf of himself and the Class of all others similarly situated as defined below, files this *Complaint* against Defendants and alleges the following based on (a) personal knowledge, (b) the investigation of counsel, and (c) information and belief.

**INTRODUCTION**

1.    Plaintiff brings this action on behalf of himself and a proposed class of purchasers and users of Continuous Positive Airway pressure (CPAP), Bi-Level Positive Airway Pressure (Bi-Level PAP) devices and mechanical ventilators manufactured by Philips, which contain polyester-based polyurethane sound abatement foam ("PE-PUR Foam").

2.      On April 26, 2021, Philips made a public announcement which disclosed, for the first time, that it had determined there were risks that the PE-PUR Foam used in certain CPAP, Bi-Level PAP, and mechanical ventilator devices it manufactured may degrade or off-gas under certain circumstances.

3.      On June 14, 2021, Philips issued a recall in the United States of its CPAP, Bi-Level PAP, and mechanical ventilator devices containing PE-PUR Foam, because Philips determined that (a) the PE-PUR Foam was at risk for degradation into particles that may enter the devices' pathway and be ingested or inhaled by users, and (b) the PE-PUR Foam may off-gas certain chemicals during operation.[1]  Philips further disclosed in its Recall Notice that "these issues can result in serious injury which can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment.[2]

4.      Philips has disclosed that the absence of visible particles in the devises does not mean that PE-PUR Foam breakdown has not already begun.  Philips reported that lab analysis of the degraded foam reveals the presence of harmful chemicals, including but not limited to: Toluene Diamine ("TDA"), Toluene Diisocyanate ("TDI"), and Diethylene Glycol ("DEG").[3]

5.      Prior to issuing the Recall Notice, Philips received user reports regarding the presence of black debris/particles within the airpath circuit of its devices (extending from the device outlet, humidifier, tubing, and mask).  Philips also received reports of headaches, upper airway irritation, cough, chest pressure and sinus infection from users of these devices.

---

[1] *See* Philips Recall Notice attached hereto as Exhibit "A."

[2] *Id.*

[3] Philips Sleep and Respiratory Care Update; Clinical information for physicians, https://www.philips.com/c-dam/b2bhc/master/landing-pages/src/update/documents/philips-recall-clinical-information-for-physicians-and-providers.pdf (accessed June 27, 2021).

6.      In its Recall Notice, Philips disclosed that the potential risks of particulate exposure to users of these devices include: irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (*e.g.*, kidneys and liver) and toxic carcinogenic affects.[4]  The potential risks of chemical exposure due to off-gassing of PE-PUR Foam in these devices include: headache/dizziness, irritation (eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and carcinogenic effects.[5]

7.      Philips recommended that patients using the recalled CPAP and Bi-Level PAP devices immediately discontinue using their devices and that patients using the recalled ventilators for life-sustaining therapy consult with their physicians regarding alternative ventilator options.

8.      Upon information and belief, in 2012, Plaintiff purchased a Philips Respironics DreamStation CPAP device that he used nightly from 2012 until April 2022.

9.      Plaintiff has experienced many health issues since, and while, using his Philip's CPAP device, including, but not limited to, kidney failure, sore throat, dizziness, hypersensitivity, shortness of breath, kidney disease/renal disease, heart failure, inflammation and fluid build-up in the lungs, and headaches.  Plaintiff has further experienced anxiety concerning the potential serious health risks he is facing from possible exposure to off-gassed or degraded PE-PUR Foam in the recalled devices.

10.      Plaintiff seeks to recover damages based on, *inter alia*, Philips' breach of express warranty, breach of implied warranties, design defects (strict liability and negligence), failure to warn, manufacturing defects (strict liability and negligence), warning defects, and other

---

[4] *Id.*

[5] *Id.*

misrepresentations and/or omissions, in connection with its manufacture, marketing and sales of devices containing PE-PUR Foam on behalf of himself and the proposed Class. In addition, Plaintiff seeks medical monitoring damages for users of Philips' devices identified in the Recall Notice who are at risk of suffering from serious injury, including irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (*e.g.*, kidneys and liver) and toxic carcinogenic affects.

## PARTIES

11.    Plaintiff James E. Whitescarver is a citizen of Casa Grande, Pinal County, Arizona.

12.    Defendant, Koninklijke Philips N.V. ("Royal Philips") is a Dutch multinational corporation with its principal place of business located at Philips Center, Amstelplein 2, 1096 BC Amsterdam, Netherlands. Royal Philips is the parent company of the Philips Group of healthcare technology businesses, including Connected Care businesses focusing on Sleep & Respiratory Care. Royal Philips holds directly or indirectly 100% of its subsidiaries Philips North America, LLC, Philips Holding USA, Inc., Philips RS North America, and Philips RS North America Holding Corporation (the "Philips Group").[6] Upon information and belief, Royal Philips controls the Philips Group in all respects, including manufacturing, selling, distributing, and supplying of the recalled CPAP, Bi-Level PAP, and mechanical ventilator devices.[7]

13.    Defendant, Philips North America LLC ("Philips NA") is a Delaware corporation with its principal place of business located at 222 Jacobs Street, Floor 3, Cambridge,

---

[6] Philips 2020 annual filing with the SEC, fn. 8, https://www.sec.gov/Archives/edgar/data/313216/000031321621000008/phg-exhibit8.htm (accessed June 30, 2021).
[7] Philips 2020 annual filing with the SEC, https://www.sec.gov/ix?doc=/Archives/edgar/data/0000313216/000031321621000008/phg-20201231.htm (accessed June 30, 2021).

Massachusetts 02141. Based upon information and belief Philips NA is a wholly-owned subsidiary of Royal Philips and Philips NA manages the operation of the Royal Philips' various lines of business, including Philips RS, in North America. Philips NA may be served through its registered agent, Corporation Service Company, at 1201 Hays Street, Tallahassee, FL 32301-2525.

14.      Defendant, Philips RS North America LLC ("Philips RS") is a Delaware corporation with its principal place of business located at 6501 Living Place, Pittsburgh, Pennsylvania 15206. Philips RS is a wholly-owned subsidiary of Royal Philips. Philips RS was formerly operated under the business name Respironics, Inc. ("Respironics"). Royal Philips acquired Respironics in 2008.[8] Philips RS may be served through its registered agent, Corporation Service Company, at 1201 Hays Street, Tallahassee, FL 32301-2525.

15.      Defendant, Philips Holding USA, Inc. (PHUSA) is a Delaware corporation with its principal place of business located at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141. PHUSA is a holding company that is the sole member of Defendant, Philips NA. PHUSA may be served through its registered agent, Corporation Service Company, at 1201 Hays Street, Tallahassee, FL 32301-2525.

16.      Defendant, Philips RS North America Holding Corporation ("RS Holding") is a Delaware corporation with its principal place of business located at 222 Jacobs Street, Cambridge, Massachusetts 02141, and is wholly owned by PHUSA. Accordingly, Philips RS North America Holding Corporation is a citizen of Massachusetts and Delaware. RS Holding may be served through its registered agent, Corporation Service Company, at 1201 Hays Street, Tallahassee, FL 32301-2525.

---

[8] Philips announces completion of tender offer to acquire Respironics, WEB WIRE, https://www.webwire.com/ViewPressRel.asp?aId=61199 (accessed June 27, 2021).

17.    Defendant, Wm. T. Burnett Foam LLC ("Burnett Foam") is a limited liability company organized and existing under the laws of the State of Maryland and has a principal place of business at 1500 Bush Street, Baltimore, Maryland 21230.  Burnett Foam may be served through its registered agent at Wm. T. Burnett Management, Inc., 1500 Bush Street, Baltimore, MD 21230.

18.    Defendant, Wm. T. Burnett Management, Inc. ("Burnett Management") is a corporation organized and existing under the laws of the State of Maryland and has a principal place of business at 1500 Bush Street, Baltimore, Maryland 21230.  Burnett Management may be served through its registered agent at Wm. T. Burnett Management, Inc., 1500 Bush Street, Baltimore, MD 21230.

19.    Defendant, Wm. T. Burnett & Co. ("Burnett & Co.") is a corporation owned and operated by Burnett Management, is organized and existing under the laws of the State of Maryland and has a principal place of business at 1500 Bush Street, Baltimore, Maryland 21230.

20.    Defendant, Wm. T. Burnett & Co., Incorporated ("Burnett & Co., Inc.") is a textile corporation organized and existing under the laws of the State of Maryland, has a principal place of business located at 1500 Bush Street, Baltimore, Maryland 21230 and may be served through its registered agent, Richard B. C. Tucker, Jr. Inc., located at 1500 Bush Street, Baltimore, Maryland 21230.

21.    Defendant, Wm. T. Burnett Holding LLC ("Burnett Holding") is a limited liability company organized and existing under the laws of the State of Maryland and has a principal place of business located at 1500 Bush Street, Baltimore, Maryland 21230.  The Burnett Holding corporate family is comprised of a total of six companies.  Burnett Holding may be

served through its registered agent at Wm. T. Burnett Management, Inc., located at 1500 Bush Street, Baltimore, Maryland 21230.

22.     Defendant, Wm. T. Burnett Fiber LLC ("Burnett Fiber") is a limited liability company organized and existing under the laws of the State of Maryland and has a principal place of business located at 1500 Bush Street, Baltimore, Maryland 21230.  Burnett Fiber may be served through its registered agent at Wm. T. Burnett Management, Inc., located at 1500 Bush Street, Baltimore, Maryland 21230.

23.     Defendant, Wm. T. Burnett IP LLC ("Burnett IP") is a limited liability company organized and existing under the laws of the State of Maryland and has a principal place of business located at 1500 Bush Street, Baltimore, Maryland 21230.  Burnett Fiber may be served through its registered agent at Wm. T. Burnett Management, Inc., located at 1500 Bush Street, Baltimore, Maryland 21230.

24.     Royal Philips, Philips NA, Philips RS, PHUSA, and Philips Holding are hereinafter sometimes referred to as "Philips" or the "Philips Defendants".  Burnett Foam, Burnett Management, Burnett & Co., Burnett Holding, Burnett & Co., Inc., Burnett Fiber and Burnett IP are hereinafter sometimes referred to as "Burnett" or the "Burnett Defendants".  Both Philips and Burnett are hereinafter sometimes referred to as "Defendants".

## **JURISDICTION AND VENUE**

25.     This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because: (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; (2) the action is a class action; (3) there are members of the Class who are diverse from Defendants, and; (4) there are more than 100 class members.  This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C.

§ 1367 because they form part of the same case or controversy as the claims within the Court's original jurisdiction.

26.     Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391 (b) and (c) and 18 U.S.C. § 1965, because Defendants transact business in this District, a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District; because the Plaintiff resides in this District; and because the Defendants caused harm to Class Members residing in the District.

27.     The Court has personal jurisdiction over the Defendants because Defendants conduct substantial business in this District, and the events giving rise to Plaintiff's claims arise out of and relate to Defendants' contacts with this District.  Further, Defendants have transacted business, maintained substantial contacts, purposefully targeted consumers and medical professionals for sales of its devices and/or committed overt acts in furtherance of the unlawful acts alleged in this complaint in this District, as well as throughout the United States. The unlawful acts of Defendants have been directed at, targeted, and have had the effect of causing injury to persons residing in, located in, or doing business in this District, as well as throughout the United States.

## FACTUAL BACKGROUND

### I.     Continuous Positive Airway Pressure Therapy

28.     Continuous Positive Airway Pressure ("CPAP") therapy is a common nonsurgical treatment primarily used to treat sleep apnea and other respiratory conditions and/or illnesses. CPAP therapy typically involves the use of a hose and a nasal or facemask device that delivers constant and steady air pressure to an individual's throat to help that person breathe.

29.     Sleep apnea is a common sleep disorder characterized by repeated interruptions in

breathing throughout an individual's sleep cycle.  These interruptions, called "apneas," are caused when the soft tissue in an individual's airway collapses.  The airway collapse prevents oxygen from reaching the individual's lungs which can cause a buildup of carbon dioxide.  If the individual's brain senses the buildup of carbon dioxide, it will briefly rouse the individual from sleep so that the individual's airway can reopen.  Often these interruptions are so brief that the individual will not remember.  Despite the brevity of the interruptions, the sleep cycle disruption caused by sleep apnea can dramatically impact a person's lifestyle, including negatively impacting energy, mental performance, and long-term health.  CPAP therapy helps treat sleep apnea by preventing the person's airway from collapsing while breathing during sleep cycles, which can help prevent interruptions in breathing.

## II.    Bi-Level Positive Airway Pressure Therapy

30.    Bi-Level Positive Airway Pressure ("BiPAP") therapy is a common alternative to CPAP therapy for treating sleep apnea.  Similar to CPAP therapy, BiPAP therapy is nonsurgical and involves the use of a nasal or face mask device to maintain air pressure in an individual's airway.  BiPAP therapy is distinguishable from CPAP therapy, however, because Bi-Level PAP devices deliver two alternating levels – inspiratory and expiratory – of pressurized air into a person's airway, rather than the single continuous level of pressurized air delivered by a CPAP device.  The inspiratory positive airway pressure assists a person as a breath is taken in.  Conversely, the expiratory positive airway pressure is applied to allow a person to comfortably breathe out.  Bi-Level PAP devices deliver one level of pressurized air (the inspiratory positive level) to assist as the person inhales, and another level (the expiratory level) as the person exhales.

### III.    Mechanical Ventilation

31.    Mechanical ventilation is a treatment to help a person breathe when they find it difficult or are unable to breathe on their own.  A mechanical ventilator pushes airflow into the patient's lungs to help them breathe.  Mechanical ventilation may be invasive ventilation with a tube inserted into the patient's airway, performed in the intensive care unit in a hospital or long-term institutional setting.  Non-invasive ventilation can be used at home by people with respiratory conditions or difficulties.

### SUBSTANTIVE ALLEGATIONS

32.    Philips developed, marketed, and sold a variety of CPAP and Bi-Level PAP respirator devices and mechanical ventilators under its "Sleep & Respiratory Care" segment of its business which was designed to assist individuals with a number of sleep, breathing and respiratory conditions, including obstructive sleep apnea, central sleep apnea, complex sleep apnea syndrome, and Chronic Obstructive pulmonary Disease (COPD), as well as to assist those individuals requiring invasive and non-invasive ventilators for acute and sub-acute hospital environments.  Philips' CPAP and Bi-Level PAP respirator devices and its mechanical ventilators typically cost several hundred, if not thousands of dollars.  Philips has sold millions of these devices in the United States.

33.    On April 26, 2021, in its Quarterly Report for Q1 2021, Philips disclosed for the first time, under a section entitled "Regulatory Update," that device user reports had led to a discovery that the type of PE-PUR Foam Philips used to minimize noise in certain CPAP, Bi-Level PAP respirators and mechanical ventilators posed health risks to users.  Specifically, Philips disclosed that "the [PE-PUR] foam may degrade under certain circumstances, influenced by factors including use of unapproved cleaning methods, such as ozone, and

certain environmental conditions involving high humidity and temperature."[9]

34.    Seven weeks later, on June 14, 2021, Philips announced a recall of numerous models of CPAP and Bi-Level PAP devices, as well as a variety of its mechanical ventilators "to address identified potential health risks related to the polyester-based polyurethane (PE-PUR) sound abatement foam component in these devices."[10]  Specifically, Philips announced it had determined that the "PE-PUR Foam may degrade into particles which may enter the device's air pathway and be ingested or inhaled by the user, and the foam may off-gas certain chemicals."[11]  In total, Philips announced that "[b]etween 3 million and 4 million" devices are targeted in the recall.[12]

35.    The list of the devices recalled by Philips (the "Recalled Devices") includes:

| Philips CPAP and Bi-Level PAP Devices Manufactured Before April 26, 2021 Subject to Recall[13] | |
|---|---|
| **Device Name/Model Type** | **Type** |

---

[9] First Quarter Results, PHILIPS (Apr. 26, 2021), https://www.results.philips.com/publications/q121/downloads/pdf/en/philips-first-quarter-results-2021-report.pdf (accessed June 27, 2021).

[10] *Philips issues recall notification \* to mitigate potential health risks related to the sound abatement foam component in certain sleep and respiratory care devices*, PHILIPS (June 14, 2021), https://www.philips.com/a-w/about/news/archive/standard/news/press/2021/20210614-philips-issues-recall-notification-to-mitigate-potential-health-risks-related-to-the-sound-abatement-foam-component-in-certain-sleep-and-respiratory-care-devices.html (accessed June 27, 2021).

[11] *Id.*

[12] Associated Press, *Philips recalls ventilators, sleep apnea machines due to health risks*, NBC NEWS, https://www.nbcnews.com/business/consumer/philips-recalls-ventilators-sleep-apea-machines-due-health-risks-n1270725

[13] Recall Notice (Exhibit "A" hereto); *see also* Medical Device recall notification (U.S. only) / field safety notice (International Markets), PHILIPS RESPIRONICS (June 14, 2021) https://www.usa.philips.com/healthcare/e/sleep/communications/src-update#section_2 (accessed June 27, 2021); Royal Philips Update on the recall notification, https://www.philips.com/a-w/about/news/archive/standard/news/press/2021/20210614-philips-issues-recall-notification-to-mitigate-potential-health-risks-related-to-the-sound-abatement-foam-component-in-certain-sleep-and-respiratory-care-devices.html (accessed June 27, 2021).

| E30 (Emergency Use Authorization) | Continuous Ventilator, Minimum Ventilatory Support, Facility Use |
|---|---|
| DreamStation ASV | Continuous Ventilator, Non-life Supporting |
| DreamStation ST, AVAPS | |
| SystemOne ASV4 | |
| C Series ASV | |
| C Series S/T and AVAPS | |
| OmniLab Advanced Plus | |
| SystemOne (Q Series) | Non-continuous Ventilator |
| DreamStation | |
| DreamStation GO | |
| Dorma 400 | |
| Dorma 500 | |
| REMStar SE Auto | |

| Philips Mechanical Respirator Devices Manufactured Before April 26, 2021 Subject to Recall[14] | |
|---|---|
| Device Name/Model Type | Type |
| Trilogy 100 Ventilator | Continuous Ventilator |
| Trilogy 200 Ventilator | |
| Garbin Plus, Aeris, LifeVent Ventilator | |
| A-Series BiPAP Hybrid A30 | Continuous Ventilator, Minimum Ventilatory Support, Facility Use |
| Philips A-Series BiPAP V30 Auto | |
| Philips A-Series BiPAP A40 | Continuous Ventilator, Non-life Supporting |
| Philips A-Series BiPAP A30 | |
| | |

36.    According to Philips, the PE-PUR Foam used in Recalled Devices puts users at risk of suffering from: "[i]rritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (*e.gi* kidneys and liver) and toxic carcinogenic affects."[15]

37.    Philips reported to physicians that PE-PUR Foam particles "may cause irritation

---

[14] *Id.*

[15] *Id.*

and airway inflammation, and this may be particularly important for patients with underlying lung diseases or reduced cardiopulmonary reserve."[16]

38.    Further, Philips reported that "based on lab testing and evaluations, it may be possible that these potential health risks could result in a wide range of potential patient impact, from transient potential injuries, symptoms and complications, as well as possibly serious injury which can be life-threatening or cause permanent impairment, or require medical intervention to preclude permanent impairment."[17]

39.    Philips announced that it has received reports of specific complaints from users of Recalled Devices who suffered from "headache[s], upper airway irritation, cough, chest pressure and sinus infection."[18]

**I.    The Health Risks Associated with Use of Recalled Devices Renders Them Worthless**

40.    As a result of the health risks associated with the use of the Recalled Devices, together with Defendants' concealment of these risks from the date they were first reported to Defendants or discovered by Defendants through April 26, 2021, the Recalled Devices have been rendered completely worthless or, at the very least, have substantially diminished in value.

41.    The information described above, including the now-known health risks associated with use of Philips CPAP devices, Bi-Level PAP devices and mechanical ventilators, the recall, and the medical warnings and advice issued by Philips, have rendered the Recalled Devices

---

[16] Philips *Sleep and Respiratory Care Update – Clinical information for physicians*, June 14, 2021, https://www.philips.com/c-dam/b2bhc/master/landing-pages/src/update/documents/global-corporate/philips-clinical-information-for-physicians-and-providers.pdf (accessed June 27, 2021).

[17] *Id.*

[18] Recall Notice (Exhibit A hereto).

worthless to patients with sleep apnea and other respiratory conditions. Individuals not using life-supporting ventilators must immediately discontinue their use of the Recalled Devices or face serious health risks as grave as organ failure, cancer or death. If they choose to discontinue use of the Recalled Device, they must pay for another expensive device in order to receive effective treatment for their sleep apnea or other respiratory condition. Individuals using life-supporting ventilators must seek and alternative treatment before discontinuing use of the Recalled Devices.

42.     Recognizing this, Philips issued the following advice to patients using any of the Recalled Devices:

- **"For patients using BiLevel PAP and CPAP devices:** Discontinue use of affected units and consult with physicians to determine the benefits of continuing therapy and potential risks."[19]

- **"For patients using life-sustaining mechanical ventilator devices: DO NOT discontinue or alter prescribed therapy, without consulting physicians to determine appropriate next steps."[20]**

43.     As a result of the above, Plaintiff and the Class will have to undertake considerable expense in replacing the Recalled Devices.

## II.     Philips Unreasonably Delayed its Recall of the Defective Devices

44.     At no time prior to its Regulatory Update on April 26, 2021, did Philips disclose to purchasers or users of the Recalled Devices that the PE-PUR Foam contained therein may off-gas or degrade upon use. Similarly, prior to the Update, Philips did not disclose any health risks associated with use of the Recalled Devices.

---

[19] Medical Device recall notification (U.S. only) / field safety notice (International Markets), PHILIPS RESPIRONICS (June 14, 2021), https://www.usa.philips.com/healthcare/e/sleep/communications/src-update#sectionf_2 (accessed June 27, 2021) (Questions and answers) (emphasis in original).

[20] *Id.*

45.     Defendants have not disclosed when they first discovered or received reports from users of their Sleep & Respiratory Care devices "regarding the presence of black debris/particles within the airpath circuit (extending from the device outlet, humidifier, tubing, and mask)."[21]

46.     At a minimum, as a result of user reports, Defendants were aware of the off-gassing and degradation of the PE-PUR Foam used in the Recalled Devices at some point prior to the recall.  Yet, Defendants continued to manufacture, sell or otherwise place into the stream of commerce, the Recalled Devices with such awareness.  During this period, Defendants unreasonably put users of the Recalled Devices at risk of developing serious adverse health effects, including organ failure and cancer.

47.     Based upon information and belief, Defendants knew of the potential health risks associated with use of its recalled devices related to PE-PUR Foam degradation well-before notifying the public on June 14, 2021.[22]

48.     Further, upon information and belief, Burnett knew of the possibility of PE-PUR Foam degradation since it began manufacturing the foam for Philips' devices.

49.     Upon information and belief, Burnett continued to manufacture the PE-PUR Foam despite being on express notice of the risks associated with the foam degradation.

50.     Upon information and belief, Philips knew about the possibility of PE-PUR Foam degradation since it began using this particular foam in its devices.

51.     Upon information and belief, Philips knew about the possibility of PE-PUR Foam degradation since or before it began researching or developing the DreamStation device.

---

[21] Recall Notice (Exhibit "A" hereto).
[22] Department of Health and Human Services.  (2021, November 9). *Form FDA 483*. Retrieved February 25, 2022, from https://www.fda.gov/media/154099/download

52.     Upon information and belief, Philips knew of the risk that degraded PE-PUR Foam could produce toxic and carcinogenic particulates as well as VOC gas emissions.

53.     Upon information and belief, Philips knew or should have known of the risk that incorporating PE-PUR Foam into the air pathways of subject devices could result in users ingesting and/or inhaling toxic and carcinogenic particulates and/or VOC gas emissions.

54.     An adverse event report from the FDA Manufacturer and User Facility Device Experience ("MAUDE") database show that, as early as 2011, Respironics learned that a patient reported discovering "black dust" on her nose when she awoke the morning after using a RemStar CPAP device and subsequently underwent treatment for "intoxication" and "chest tightness."

55.     Following the report, Philips investigated and confirmed that the device contained "evidence of an unknown black substance in the air path and on internal components . . . present throughout both the intake and exhaust portions of the air path. . ."[23]

56.     Philips denied that the presence of the black substance was due to a product defect.[24]

**III.    Plaintiff James E. Whitescarver**

57.     Plaintiff James E. Whitescarver is a resident and citizen of Casa Grande, Pinal County, Arizona.

58.     Plaintiff purchased one of the Recalled Devices, a Philips Respironics DreamStation CPAP device, prior to June 14, 2021.

---

[23] MAUDE, Adverse Event Report:  RESPIRONICS, INC. REMSTAR PRO INTERNATIONAL, https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfmaude/detail.cfm?mdrfoiid=2000987&pc=BZD, visited on February 25, 2022.
[24] *Id.*

59.     The manuals accompanying Plaintiff Whitescarver's Philips Respironics DreamStation CPAP device did not contain any language or warnings of health risks associated with use of the device, including irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (*e.g.*, kidneys and liver) and toxic carcinogenic effects.  Had Defendants informed Plaintiff of these risks, he would not have purchased or used the Recalled Device.

60.     Without knowing of the health risks associated with use of the Recalled Devices, Plaintiff used his Recalled Device regularly to treat sleep apnea until approximately April 2022.

61.     As a result of the health risks associated with continued use of these devices and the recall, Plaintiff Whitescarver's DreamStation CPAP device is now worthless. Plaintiff was forced to replace the device at considerable cost.

## TOLLING AND ESTOPPEL

### I.     Discovery Rule Tolling

62.     Plaintiff and the Class had no way of knowing about Philips' conduct with respect to the health risks associated with the use of the Recalled Devices.

63.     Neither Plaintiff nor any other members of the Class, through the exercise of reasonable care and diligence, could have discovered the conduct by Philips alleged herein. Further, Plaintiff and members of the Class did not discover and did not know of facts that would have caused a reasonable person to suspect that Philips was engaged in the conduct alleged herein.

64.     For these reasons, all applicable statutes of limitations have been tolled by the discovery rule with respect to claims asserted by Plaintiff and the Class.

## II.    Fraudulent Concealment Tolling

65.    By failing to provide immediate notice of the adverse health effects associated with continued use of the Recalled Devices, Philips concealed its conduct and the existence of the claims asserted herein from Plaintiff and the members of the Class.

66.    Upon information and belief, Philips intended to conceal the facts and claims from Plaintiff and members of the Class.  Plaintiff and the members of the Class were unaware of the facts alleged herein without any fault or lack of diligence on their part and could not have reasonably discovered Defendants' conduct.  For this reason, any statute of limitations that otherwise may apply to the claims of the Plaintiff or members of the Class should be tolled.

## <u>CLASS ACTION ALLEGATIONS</u>

67.    Plaintiff seeks certification on behalf of a class defined as follows (the "Class"):

**STATE CLASS**: All persons who were or are citizens of the State of Arizona who purchased or used a CPAP, Bi-Level PAP, or Mechanical Ventilator device that was manufactured by Philips before April 26, 2021, and recalled by Philips on June 14, 2021.

68.    Plaintiff reserves the right to modify or refine the definitions of the Class based upon discovery of new information and in order to accommodate any of the Court's manageability concerns.

69.    Excluded from the Class are: (a) any Judge or Magistrate Judge presiding over this action and members of their staff, as well as members of their families; (b) Defendants' and Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendants or their parents have a controlling interest, as well as Defendants' current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Class; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) counsel for Plaintiff and

Defendants; and (f) the legal representatives, successors, and assigns of any such excluded persons.

70.    **Numerosity (Rule 23(a)(1)).**  The Class is so numerous that joinder of individual members herein is impracticable.  The exact number of members of the Class, as herein identified and described, is not known, but sales figures and the Recall Notice indicate that millions of individuals have purchased the Recalled Devices.

71.    **Commonality (Rule 23 (a)(2)).**  Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class members, including the following:

- whether Defendants owed a duty of care to Plaintiff and the Class;

- whether Defendants knew or should have known that the PE-PUR Foam used for sound abatement posed health risks;

- whether Defendants wrongfully represented that the PE-PUR Foam used for sound abatement in the Recalled Devices was safe;

- whether the Recalled Devices retained any value post-recall;

- whether Defendants wrongfully represented that the Recalled Devices were safe to use;

- whether Defendants wrongfully failed to disclose that the PE-PUR Foam used for sound abatement in the Recalled Devices posed health risks to Recalled Device users;

- whether Defendants' representations and omissions in advertising, warranties, packaging, and/or labeling were false, deceptive, and/or misleading;

- whether those representations and omissions were likely to deceive a reasonable

consumer;

- whether a reasonable consumer would consider the presence, or risk of, health risks as a material fact in purchasing one of the Recalled Devices;

- whether Defendants had knowledge that those representations and omissions were false, deceptive, and misleading;

- whether Defendants breached their express warranties;

- whether Defendants breached their implied warranties;

- whether Defendants engaged in unfair trade practices;

- whether Defendants engaged in false advertising;

- whether Defendants' conduct was negligent per se;

- whether Defendants made negligent and/or fraudulent misrepresentations and/or omissions; and

- whether Plaintiff and the members of the Class are entitled to actual, statutory, and punitive damages.

72.     **Typicality (Rule 23(a)(3)).**  Plaintiff's claims are typical of the claims of the other members of the proposed Class.  Plaintiff and members of the Class (as applicable) suffered injuries as a result of Defendants' wrongful conduct that is uniform across the Class.

73.     **Adequacy (Rule 23(a)(4)).**  Plaintiff's interests are aligned with the Class he seeks to represent.  Plaintiff has and will continue to fairly and adequately represent and protect the interest of the Class.  Plaintiff has retained competent counsel highly experienced in complex litigation and class actions and the types of claims at issue in this litigation, with the necessary resources committed to protecting the interests of the Class.  Plaintiff has no interest that is antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff.

Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class. Neither Plaintiff nor Plaintiff's counsel have any interest adverse to those of the other members of the Class.

74. **Superiority.** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy, and joinder of all members of the Class is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the Courts and Defendants, would create a risk of inconsistent or varying adjudications of the questions of law and fact common to members of the Class, and would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

75. **Manageability.** This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

76. Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

#### BREACH OF EXPRESS WARRANTY
**(on behalf of the class)**

77. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

78.    Philips marketed and sold the Recalled Devices into the stream of commerce with the intent that the Recalled Devices would be purchased by Plaintiff and the Class.

79.    Philips expressly warranted, advertised, and represented to Plaintiff and the Class that the Recalled Devices were safe and appropriate for human use.

80.    Philips made these express warranties regarding the recalled Devices' quality and fitness for use in writing through its website, advertisements, and marketing materials, and on the Recalled Devices' packaging and labels.  These express warranties became part of the basis of the bargain that Plaintiff and the Class entered into upon purchasing the Recalled Devices.

81.    Philips' advertisements, warranties, representations, and omissions regarding health risks associated with the Recalled Devices were made in connection with the sale of the Recalled Devices to Plaintiff and the Class.  Plaintiff and the Class relied on Philips' advertisements, warranties, representations, and omissions regarding the Recalled Devices in deciding whether to purchase and use Philips' Recalled Devices.

82.    Philips' Recalled Devices do not conform to Philips' advertisements, warranties, representations, and omissions in that they are not safe, healthy, and/or appropriate for human use, and pose risks of serious injury and disease, including organ failure and cancer.

83.    Philips therefore breached its express warranties by placing Recalled Devices into the stream of commerce and selling them to Plaintiff and consumer Class members, when use of said devices posed health risks, had dangerous effects and was unsafe, thus rendering these products unfit for their intended use and purpose, and unsafe and unsuitable for consumer use as marketed by Philips.  These associated health effects substantially impair the use, value, safety of the Recalled Devices, and render them worthless.

84.     Philips was aware, of should have been aware, of the toxic and/or carcinogenic health effects associated with use of the Recalled Devices. However, nowhere on the package labeling or package inserts, nor on Philips' websites or other marketing materials did Philips warn Plaintiff and members of the Class that they were at risk of developing adverse health conditions as a result of the dangerous PE-PUR Foam used in the Recalled Devices.

85.     Instead, Philips concealed the dangerous health effects of the PE-PUR Foam used in the Recalled Devices and deceptively represented that these products were safe, healthy, and appropriate for use. Thus, Philips utterly failed to ensure that the material representations they were making to consumers were true.

86.     The adverse health effects associated with use of the Recalled Devices existed when they left Philips' possession or control and were sold to Plaintiff and members of the Class. The dangers associated with use of the Recalled Devices were undiscoverable by Plaintiff and members of the Class at the time of purchase of the Recalled Devices.

87.     As manufacturers, marketers, advertisers, distributors and sellers of the Recalled Devices, Philips had exclusive knowledge and notice of the fact that the Recalled Devices did not conform to the affirmations of fact and promises.

88.     In addition, or in the alternative, to the formation of an express contract, Philips made each of the above-described representations and omissions to induce Plaintiff and members of the Class to rely on such representations and omissions when purchasing and/or using the Recalled Devices.

89.     Philips' affirmations of fact and promises and its omissions were material, and Plaintiff and members of the Class reasonably relied upon such representations and omissions in purchasing and/or using the Recalled Devices.

90.     All conditions precedent to Philips' liability for its breach of express warranty have been performed by Plaintiff or members of the Class.

91.     Affording Philips an opportunity to cure its breaches of written warranties would be unnecessary and futile here.  Philips was placed on reasonable notice from user reports and its own lab testing that the PE-PUR Foam in the Recalled Devices was unsafe.  Philips had ample opportunity to either stop using the PE-PUR Foam, or to replace the PE-PUR Foam in the Recalled Devices to make them safe and healthy for use by Plaintiff and members of the Class.  However, Philips failed to do so until now.

92.     As a direct and proximate result of Philips' breaches of express warranty, Plaintiff and members of the Class have been damaged because they did not receive the products as specifically warranted by Philips.  Plaintiff and members of the Class did not receive the benefit of the bargain and suffered damages at the point of sale stemming from their overpayment for the Recalled Devices.

93.     Plaintiff and the Class seek actual damages, attorneys' fees, costs, and any other just and proper relief available thereunder for Philips' failure to deliver goods conforming to their express warranties and resulting breach.

## SECOND CLAIM FOR RELIEF

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (on behalf of the Class)

94.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

95.     Philips are merchants engaging in the sale of goods to Plaintiff and the Class.

96.     There was a sale of goods from Philips to Plaintiff and the Class.

97.     At all times mentioned herein, Philips manufactured or supplied the Recalled Devices, and prior to the time the Recalled Devices were purchased by Plaintiff and the Class,

Philips impliedly warranted to them that the Recalled Devices were of merchantable quality, fit for their ordinary and foreseeable use, and conformed to the promises and affirmations of fact and omissions made on the Recalled Devices' labels and packaging, including that the Recalled Devices were safe and appropriate for human use.  Plaintiff and the Class relied on Philips' promises and affirmations of fact and omissions when they purchased and used the Recalled Devices.

98.     Contrary to these representations and warranties, the Recalled Devices were not fit for their ordinary and foreseeable use and did not conform to Philips' affirmations of fact and promises and omissions because use of the Recalled Devices is accompanied by the risk of adverse health effects, which does not conform to the labels and packaging of these devices.

99.     Philips breached its implied warranties by selling Recalled Devices that failed to conform to the promises or affirmations of fact made on the packaging or labels, as use of each Recalled Device was accompanied by the risk of developing adverse health effects that do not conform to the packaging or labels.

100.     Philips was on notice of this breach as it was made aware of the adverse health effects accompanying use of the Recalled Devices through user reports submitted to Philips and through its own lab testing.

101.     Privity exists because Philips impliedly warranted to Plaintiff and the Class through the warranting, packaging, advertising, marketing, and labeling that the Recalled Devices were safe and suitable for use to treat health conditions, though Philips made no mention of the attendant health risks associated with use of the Recalled Devices.

102.     As a direct and proximate result of Philips' conduct, Plaintiff and the Class have suffered actual damages in that each Recalled Device they purchased is worth less than the

price they paid and which they would not have purchased at all had they known of the attendant health risks associated with the use of each Recalled Device.

103.    Plaintiff and the Class seek actual damages, attorneys' fees, costs, and any other just and proper relief available thereunder for Philips' failure to deliver goods conforming to their implied warranties and resulting breach.

## THIRD CLAIM FOR RELIEF

### FRAUDULENT MISREPRESENTATION
(on behalf of the Class)

104.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

105.    Philips failed to advise Plaintiff and the Class that the Recalled Devices posed serious health risks to their users and Philips falsely represented to Plaintiff and the Class that the Recalled Devices were safe for human use.

106.    Philips intentionally, knowingly, and recklessly made these misrepresentations and omissions to induce Plaintiff and the Class to purchase the Recalled Devices.

107.    Philips knew that its representations and omissions about the Recalled Devices were false in that the Recalled Devices contained PE-PUR Foam and thus were at risk of causing adverse health effects to users of said Devices and said risks were not identified in the products' labels, packaging, advertising, and statements.  Philips knowingly allowed its packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, such as Plaintiff and the Class.

108.    Plaintiff and the Class did in fact rely on these omissions and misrepresentations and purchased and used the Recalled Devices to their detriment.  Given the deceptive manner in which Philips advertised, represented, and otherwise promoted the Recalled Devices,

Plaintiff's and the Class Members' reliance on Philips' omissions and misrepresentations was justifiable.

109.    As a direct and proximate result of Philips' conduct, Plaintiff and the Class have suffered actual damages in that they purchased the Recalled Devices (a) that were worth less than the price they paid, (b) which they would not have purchased at all had they known of the health risks, including organ failure and cancer, associated with the use of the Recalled Devices, and (c) which did not conform to the Recalled Devices' labels, packaging, advertising, and statements.

110.    Plaintiff and the Class seek actual damages, attorneys' fees, costs, and any other just and proper relief available under the laws.

**FOURTH CLAIM FOR RELIEF**

**FRAUD BY OMISSION**
**(on behalf of the Class)**

111.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

112.    Philips concealed from and failed to disclose to Plaintiff and the Class that use of the Recalled Devices is accompanied by a risk of adverse health effects, which does not conform to the products' labels, packaging, advertising, and statements.

113.    Philips was under a duty to disclose to Plaintiff and the Class the true quality, characteristics, ingredients and suitability of the Recalled Devices because: (a) Philips was in a superior position to know the true state of facts about its products; (b ) Philips was in a superior position to know the risks associated with the use of, characteristics of, and suitability of the Recalled Devices for use by individuals; and (c) Philips knew that Plaintiff and the Class could not reasonably have been expected to learn or discover prior to purchasing the Recalled

Devices that there were misrepresentations and omissions by Philips in the packaging, labels, advertising, and websites regarding the health risks associated with use of these devices.

114.    The facts concealed or not disclosed by Philips to Plaintiff and the Class were material in that a reasonable consumer would have considered them important when deciding whether to purchase the Recalled Devices.

115.    Plaintiff and the Class justifiably relied on Philips' omissions to their detriment. This detriment is evident from the true quality, characteristics, and adverse health risks associated with use of the Recalled Devices, which is contrary to how the Recalled Devices are advertised and represented by Philips.

116.    As a direct and proximate result of Philips' conduct, Plaintiff and the Class have suffered actual damages in that they purchased the Recalled Devices (a) that were worth less than the price they paid, (b) which they would not have purchased at all had they known of the health risks associated with the use of the Recalled Devices, and (c) which do not conform to the Recalled Devices' labels, packaging, advertising, and statements.

117.    Plaintiff and the Class seek actual damages, attorneys' fees, costs, and any other just and proper relief available under the laws.

## FIFTH CLAIM FOR RELIEF

### NEGLIGENT MISREPRESENTATION
### (on behalf of the Class)

118.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

119.    Philips had a duty to Plaintiff and the Class to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, distribution, and sale of the Recalled Devices.

120.    Philips breached its duty to Plaintiff and the Class by developing, testing, manufacturing, advertising, marketing, distributing, and selling products to Plaintiff and the Class that did not have the qualities, characteristics, and suitability for use as advertised by Philips and by failing to promptly remove the Recalled Devices from the marketplace or to take other appropriate remedial action upon becoming aware of the health risks of the Recalled Devices. Such developing, testing, manufacturing, advertising, marketing, distributing, and selling products to Plaintiff and the Class, and the failure to promptly remove the Recalled Devices from the marketplace or to take other appropriate remedial action upon becoming aware of the health risks of the Recalled Devices, was done for Philips' pecuniary benefit.

121.    Philips knew or should have known that the qualities and characteristics of the Recalled Devices were not as advertised or suitable for their intended and foreseeable use and were otherwise not as warranted and represented by Philips.  Specifically, Philips knew or should have known that: (a) the use of the Recalled Devices was accompanied by risk of adverse health effects that do not conform to the packaging and labeling; (b) the Recalled Devices were adulterated, or at risk of being adulterated, by the PE-PUR Foam; and (c) the Recalled Devices were otherwise not as warranted and represented by Philips.

122.    As a direct and proximate result of Philips' conduct, Plaintiff and the Class have suffered actual damages in that they purchased the Recalled Devices (a) that were worth less than the price they paid, (b) which they would not have purchased at all had they known they contained PE-PUR Foam that could cause users of the Recalled Devices to suffer adverse health effects, and (c) which do not conform to the products' labels, packaging, advertising, and statements.

123.    Plaintiff and the Class seek actual damages, attorneys' fees, costs, and any other just and proper relief available.

## SIXTH CLAIM FOR RELIEF

### UNJUST ENRICHMENT
### (on behalf of the Class)

124.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

125.    Plaintiff and the Class conferred substantial benefits on Philips through their purchase of the Recalled Devices.  Philips knowingly and willingly accepted and enjoyed these benefits.

126.    Philips either knew or should have known that the payments rendered by Plaintiff and the Class were given with the expectation that the Recalled Devices would have the qualities, characteristics, and suitability for use represented and warranted by Philips.  As such, it would be inequitable for Philips to retain the benefit of the payments under these circumstances.

127.    Philips' acceptance and retention of these benefits under the circumstances alleged herein make it inequitable for Philips to retain the benefits without payment of the value to Plaintiff and the Class.

128.    Plaintiff and the Class are entitled to recover from Philips all amounts wrongfully collected and improperly retained by Defendants, plus interest thereon.

129.    Plaintiff and the Class seek actual damages, attorneys' fees, costs, and any other just and proper relief available under the laws.

## SEVENTH CLAIM FOR RELIEF

### MEDICAL MONITORING
**(on behalf of the Class, except for Class Members
who purchased a Recalled Device for business use only)**

130.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

131.    At all relevant times, the Defendants designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed the Recalled Devices into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that used them, such as Plaintiff and the Class.

132.    Defendants have reported that users of the Recalled Devices face risks of serious injury from the degradation of PE-PUR Foam contained in the Recalled Devices.  Degradation of PE-PUR Foam may be caused by exposure to chemical emissions from the foam material, high heat and high humidity environments in certain regions.

133.    When PE-PUR Foam degrades, particulate matter that may enter the device air pathway and be ingested or inhaled by users of the devices.  Users face significantly increased risk of serious injuries that can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment.  The potential risks associated with degraded foam exposure include: irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (*e.g.*, kidneys and liver) and toxic carcinogenic effects, up to and including death.

134.    The off-gassing of chemicals from the PE-PUR Foam contained in the Recalled Devices poses a risk of serious injury that can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment.  The potential risks of

exposure to off-gassing from PE-PUR Foam include headache/dizziness, irritation (eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and carcinogenic effects.

135.    The absence of visible particles does not mean that PE-PUR Foam breakdown has not already begun.  Philips has reported that lab analysis of the degraded foam reveals the presence of harmful chemicals including: TDA, TDI, and DEG.[25]  TDI is a powerful irritant to the mucous membranes of the eyes and gastrointestinal and respiratory tracts,[26] and has been reported to cause Occupational Asthma.[27]  Exposure to TDA may result in ataxia, tachycardia, nausea, vomiting, convulsions, and respiratory depression.[28]  TDA can cause chemical cyanosis (*i.e.*, bluish discoloration of the skin) by converting hemoglobin to methemoglobin. This compound can also cause fatty degeneration of the liver.[29]  TDA and TDI are potential carcinogens.[30]  Repeated exposure to DEG has been associated with damage to the kidneys and renal failure.[31]

---

[25] Philips Sleep and Respiratory Care Update; Clinical information for physicians, https://www.philips.com/c-dam/b2bhc/master/landing-pages/src/update/documents/philips-recall-clinical-information-for-physicians-and-providers.pdf (accessed June 27, 2021).

[26] The National Institute for Occupational Safety and Health (NIOSH) Current Intelligence Bulletin 53, *Toluene Diisocyanate (TDI) and Toluenediamine (TDA): Evidence of Carcinogenicity*, DHHS (NOISH) Publication Number 90-101 (Dec. 1989); *see also* Gunnar Skarping, *et al., Biological monitoring of isocyanates and related amines: Test chamber exposure of humans to toluene diisocyanate*, Dep't of Occupational and Environmental Medicine, University Hospital, S-221 85 Lund, Sweden (1990); https://greenfuture.io/sustainable-living/spray-polyurethane-foam-toxic/.

[27] Bernstein, David I, *Occupational asthma: Definitions, epidemiology, causes, and risk factors*, Wolters Kluwer, UpToDate.com (accessed Jun. 30, 2021).

[28] NIOSH, *Toluene Diisocyanate (TDI) and Toluenediamine (TDA): Evidence of Carcinogenicity; see also* Skarping, *Biological monitoring of isocyanates and related amines: Test chamber exposure of humans to toluene diisocyanate*; https://green future.io/sustainable-living/spray-polyurethane-foam-toxic/.

[29] NIOSH, *Toluene Diisocyanate (TDI) and Toluenediamine (TDA): Evidence of Carcinogenicity.*

[30] *Id.* ("The excess cancer risk for workers exposed to TDI and TDA has not yet been quantified, but the probability of developing cancer should be decreased by minimizing exposure.").

[31] Greg M. Landry, *Diethylene glycol-induced toxicities show marked threshold dose response in rats*, Toxicology and Applied Pharmacology 282 (2015) 244-251 ("DEG has recently been involved in several mass epidemics of

136.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have been subjected to substantially increased risk of serious injury from off-gassing and/or degradation of PE-PUR Foam in the Recalled Devices, which is beyond normal background levels of risk.

137.    As a direct and proximate result of Defendants' conduct, Plaintiff has a significantly increased risk of suffering serious injury or contracting a serious latent disease, and suffering further injury at an unknown date in the future.  Such injuries include cancer and organ failure, among others currently unknown or just being discovered.

138.    Monitoring procedures exist that makes the early detection of damage from degraded and/or off-gassed PE-PUR Foam possible.  These procedures are different from those normally recommended in the absence of such exposure.  These monitoring procedures include non-routine surveillance studies, laboratory testing, and physical examinations, and would be reasonably necessary according to contemporary scientific principles.

139.    Existing medical research indicates that exposure to TDI, TDA, and DEG, which Philips has found to exist in off-gassed or degraded PE-PUR Foam, can cause serious, life-threatening and permanent injuries.  Philips has received reports from users of the Recalled Devices of headache, upper airway irritation, cough, chest pressure and sinus infection.  The exposure to the defects inherent in the Recalled Devices has occurred for users, such as Plaintiff, but the full extent of the injuries may not manifest until later in the Plaintiff's life.  Thus, because of Defendants' conduct, it is reasonably necessary that Plaintiff be placed under

---

renal failure and death world-wide (O'Brien et al., 1998; Schier et al., 2013).  DEG poisoning clinically manifests in metabolic acidosis, hepatotoxicity, renal failure, and peripheral neuropathy, with the hallmark being acute renal failure involving proximal tubule cell necrosis and cortical degeneration (Schep et al., 2009)"); Cohen, Jeffrey A., *Demyelinating Diseases of the Peripheral Nerves*, Nerves and Nerve Injuries (2015) ("When consumed DEG causes severe systemic and neurologic complications, including coma, seizures, peripheral neuropathy, and hepatorenal failure.").

period diagnostic testing beyond that normally recommended in the absence of use of the Recalled Devices.

140.    Plaintiff demands judgment against Defendants for medical monitoring damages to diagnose injuries caused by the Recalled Devices at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, cost of suit, attorneys' fees, and all such other relief as the Court deems proper.

## EIGHTH CLAIM FOR RELIEF

### STRICT PRODUCTS LIABILITY – DESIGN DEFECT
**(on behalf of the Class)**

141.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

142.    At all times herein mentioned, Defendants were involved in researching, designing, developing, manufacturing, testing, selling and/or distributing the Recalled Devices, including the subject device, which are both defective and unreasonably dangerous.

143.    The subject device is defective in its design or formulation in that it is not reasonably fit, suitable or safe for its intended purpose and/or its foreseeable use and the risk of use exceeds any benefits associated with its design.  The subject device is defective in design because it causes headaches, irritation of the skin, eye and respiratory tract, inflammation, respiratory issues, asthma, adverse effects to organs (including kidneys and liver), hypersensitivity, nausea, vomiting and toxic and carcinogenic effects.   It is more dangerous than other available devices indicated for similar conditions and/or use and the utility of the device does not outweigh its risks.

144.    The defective condition of the subject device rendered it unreasonably dangerous and/or not reasonably safe.  The device was in this defective condition at the time it left the hands of Defendants.  Subject device was expected to and did in fact reach Plaintiff and his

physician without substantial change in the condition in which it was designed, manufactured, labeled, sold, distributed, marketed, promoted, supplied and/or otherwise released into the stream of commerce.

145.  The subject device was used for its intended purpose by the Plaintiff in accordance with the instructions provided for use and the device was not materially altered or modified prior to its use.

146.  The subject device is defective in design because the PE-PUR Foam comprising part of the device is subject to degradation.  These characteristics cause, among other problems, cancer, kidney and liver damage/injuries and/or cardiac injuries.

147.  At or before the time the subject device was released on the market and/or sold to Plaintiff, the Defendants could have designed the product to make it less prone to causing the above-listed adverse health effects and a safer alternative design that would have prevented the type of harm experienced by the Plaintiff without substantially impairing the function of the device.

148.  Plaintiff was not able to discover, nor could he have discovered through the exercise of reasonable care and diligence, the defective nature of the subject device.  Further, in no way could Plaintiff have known that Defendants designed, developed and manufactured the subject device in such a way to make the risk of harm or injury outweigh any benefit of use.

149.  Defendants knew or should have known that the Recalled Devices, including the subject device, would be prescribed to patients and that physicians as well as their patients were relying on Defendants to furnish a suitable and safe device.  Further, Defendants knew or should have known that patients, for whom the Recalled Devices were intended, could be and would be affected by the defective design and composition of the devices.

150.    Defendants researched, designed, manufactured, tested, advertised, promoted, marketed, sold and distributed a defective device which, when used in its intended or reasonably foreseeable manner, created an unreasonable risk to the health of consumers such as Plaintiff.  Thus, Defendants are strictly liable for the injuries sustained by Plaintiff.

151.    Plaintiff and the Class were proximately and directly harmed by the design defects in the subject device.

152.    Plaintiff demands judgment against Defendants, individually, jointly, vicariously, and severally, for the design defects in the subject device as described above, together with interest, cost of suit, attorneys' fees, and all such other relief as the Court deems just and proper.

## NINTH CLAIM FOR RELIEF

### STRICT PRODUCTS LIABILITY – FAILURE TO WARN
### (on behalf of the Class)

153.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

154.    At all times mentioned herein, Defendants designed, developed, researched, tested, and knew or should have known about the significant toxic and carcinogenic risks associated with use of the subject device.

155.    At all times mentioned herein, Defendants advertised, promoted, marketed, sold and distributed the subject device that was used by the Plaintiff and the Class.

156.    The subject device was expected to and did reach the usual consumers, handlers, and persons without substantial change or modification in condition in which said device was produced, manufactured, sold, distributed and marketed by the Defendants.

157.    Defendants each had an independent and continuing duty to warn the medical community and physicians, including Plaintiff's physician, of the significance of the risks

associated with use of Recalled Devices, including the risk of cancer and other adverse health effects associated with use of the Recalled Devices and the subject device.

158. Plaintiff used the subject device in a manner which was both intended and foreseeable by Defendants.

159. The subject device was defective due to inadequate warnings because Defendants knew or should have known that the product significantly increased the risk of cancer and other adverse health effects yet Defendants failed to warn the medical community and physicians, including Plaintiff's physician, of the nature of such risks.

160. Defendants omitted and downplayed the significantly increased risk of adverse health conditions associated with use of the subject device, of which Defendants knew, or should have known, from previous testing and research prior to subject device's FDA approval.

161. The subject device's labeling and warnings were defective because they omitted necessary information and inadequately warned of the device's risk of cancer and other adverse health impacts.

162. If Defendants would have properly warned about the subject device's cancer risk and/or other health harms, no reasonable physician or consumer, including Plaintiff and Plaintiff's physician, would have recommended, prescribed or used the subject device because the potential benefits of non-obstructive sleep are substantially outweighed by the risks of cancer of other adverse health effects.

163. Had Defendants reasonably provided adequate warnings and labels concerning the risk of cancer and/or other adverse health impacts, such warnings would have been heeded and no healthcare professional would have prescribed such device, nor would any consumer purchase and/or use the subject device.

164.   Plaintiff and Class Members were proximately and directly harmed by the design defects in the subject device as described above.

## TENTH CLAIM FOR RELIEF

### STRICT LIABILITY – MANUFACTURING DEFECT
### (on behalf of the Class)

165.   Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

166.   At all times herein mentioned, Defendants were involved in researching, designing, developing, manufacturing, testing, selling and/or distributing the Recalled Devices, including the subject device, which are defective and unreasonably dangerous.

167.   The subject device was expected to and did reach Plaintiff without a substantial change in its condition.

168.   In terms of construction and quality, the subject device deviated from the specification and/or planned output in a manner which made said device defective and unreasonably dangerous.

169.   At all times relevant hereto, the Recalled Devices, including the subject device, were defectively and improperly manufactured and designed by Defendants because Defendants continued to supply consumers with Recalled Devices despite having full knowledge that the devices posed substantial and unreasonable risks of avoidable bodily injury, including cancer and other adverse health effects.

170.   The foreseeable risks associated with use of the subject device were known and could have been avoided.

171.   At all times relevant hereto, the subject device was defectively manufactured by Defendants in that its design and formulation is more dangerous than what an ordinary

consumer would reasonably expect when such device is used in an intended and reasonably foreseeable manner.

172.   At all times relevant hereto, Defendants actively deceived users and consumers in that use of the Recalled Devices was safe and use of said devices far outweighed any potential risk in use of the device.

173.   Further, the Recalled Devices, including the subject device, were defectively manufactured in that the PE-PUR Foam can degrade into particles that can enter into the devices' air pathway and can off-gas certain chemicals, including VOCs.  Said manufacturing defects cause cancer and other adverse health effects when these particles and/or chemicals enter the bodies and lungs of users.  Plaintiff and other similarly situated Class Members were unknowingly subjected to receiving differing doses of toxins, carcinogens, respiratory irritants and other deleterious compounds and contaminants when using the Recalled Devices.

174.   Plaintiff and Class Members were directly and proximately harmed by the manufacturing defects in the subject device as described above.

## ELEVENTH CLAIM FOR RELIEF

### NEGLIGENCE – DESIGN DEFECT
**(on behalf of the Class)**

175.   Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

176.   Each of the subject devices was expected to reach, and did reach, users and/or consumers without substantial change in the defective and unreasonably dangerous condition in which said devices were sold and/or distributed.

177.   Defendants owed Plaintiff a duty to exercise reasonable care in designing and testing the subject device.

178.   Defendants designed the subject device for the purpose of helping treat respiratory disorders through positive airway pressure.

179.   At all times relevant hereto, the subject devices were used in a manner intended and/or foreseeable to the Defendants.

180.   A patient or consumer using the subject device would reasonably expect the device to be free from significant defects.

181.   The subject device, as designed by Defendants, releases chemicals and off gases particles, including but not limited to, toluene diamine, toluene diisocyanate and diethylene glycol.

182.   The subject device, as designed by Defendants, directly transmits toxic and/or carcinogenic compounds and/or materials into the lungs and bodies of patients during CPAP and/or BiPAP therapy.

183.   The foreseeable risks of using the subject device, particularly respiratory illnesses up to and including death, significantly outweigh any benefit conferred upon the user of the subject device.

184.   Reasonable alternative designs existed for the subject device which would have eliminated or reduced the risk of inhalation of toxic and/or carcinogenic materials and volatile inorganic compounds.

185.   Reasonable and feasible alternative designs include but are not limited to, RESMed, 3B Medical and Apex Medical.

186.   The failure to use feasible, reasonable alternative designs that eliminate the release of chemicals and off-gasses particles renders the subject device unreasonably unsafe.

187.    Defendants knew or should have known that the Philips DreamStation device was likely to release carcinogenic chemicals and volatile organic compounds.

188.    Plaintiff and the Class were harmed by Defendants' conduct as follows:

a.    Failing to conduct adequate safety and efficacy testing before placing the subject device into the stream of commerce;

b.    Failing to timely establish procedures for reviewing the design of the subject device after receiving information that patients were developing respiratory illnesses as a result of using the subject device;

c.    Failing to timely establish procedures for validation, or, where appropriate, review and approval of design change orders for the subject device before their implementation, and;

d.    Failing to design or re-design the subject device to eliminate or mitigate the release of carcinogenic chemicals and/or volatile organic compounds.

189.    Plaintiff and Class Members were directly and proximately harmed by the design defects in the subject device as described above.

**TWELTH CLAIM FOR RELIEF**

**NEGLIGENCE – MANUFACTURING DEFECT**
**(on behalf of the Class)**

190.    Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

191.    Each of the subject devices were expected to reach, and did reach, users and/or consumers without substantial change in the defective and unreasonably dangerous condition in which said devices were sold and/or distributed.

192.    Defendants manufactured the subject device for the purpose of helping treat respiratory disorders through positive airway pressure.

193.    At all times relevant hereto, the subject device was used in a manner intended and/or foreseeable to the Defendants.

194.    A reasonable patient or consumer of the subject device would expect that said device be free from significant defects.

195.    The subject device, as manufactured by the Defendants, releases carcinogenic chemicals and/or volatile organic compounds.  The subject device, as manufactured by the Defendants, directly releases carcinogenic chemicals and/or volatile organic compounds.

196.    The foreseeable risks of using the subject device, particularly the risk of respiratory illnesses up to and including death, significantly outweigh any benefit conferred upon users of the subject devices.

197.    Plaintiff and Class Members were harmed by Defendants' conduct as follows:

a.    Failing to timely establish procedures and/or practices to prevent the subject device from releasing carcinogenic chemicals and/or volatile organic compounds;

b.    Manufacturing and selling the subject device in a state that would allow for the breakdown and release of carcinogenic chemicals and/or volatile organic compounds, and;

c.    Failing to ensure proper workmanship, materials and labeling for the subject device. Plaintiff was directly and proximately harmed by the manufacturing defects in the subject device as described above.

198.    Plaintiff and Class Members were directly and proximately harmed by the manufacturing defects in the subject device as described above.

## THIRTEENTH CLAIM FOR RELIEF

### NEGLIGENCE – WARNINGS DEFECT
**(on behalf of the Class)**

199.    Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

200.    Each of the subject devices were expected to reach, and did reach, users and/or consumers without substantial change in the defective and unreasonably dangerous condition in which said devices were sold and/or distributed to Plaintiff and the Class.

201.    Defendants owed Plaintiff and the Class a duty to exercise reasonable care in marketing, advertising, promoting, distributing and/or selling the subject device.

202.    Defendants marketed, advertised and otherwise promoted the subject device for the purpose of helping treat respiratory disorders through positive airway pressure.

203.    At all times relevant hereto, the subject device was used in a manner intended and/or foreseeable to the Defendants.

204.    A reasonable patient or consumer of the subject device would expect that the device be free from significant defects.

205.    The subject device releases toxic and/or carcinogenic chemicals as well as volatile organic compounds, and directly transmits such chemicals and compounds to patients during CPAP and/or BiPAP positive pressure therapy.

206.    Defendants knew or should have known that carcinogenic chemicals and volatile organic compounds were likely to be released from the subject device and could be spread to patients and/or users through the PE-PUR sound abatement foam

207.    The foreseeable risks of using the subject device, particularly severe respiratory disorders up to and including death, significantly outweigh any benefits conferred upon the user of the subject devices.

Plaintiff and the Class Members were harmed by the actions of the Defendants as follows:

a. Failing to warn patients like Plaintiff and/or purchasers of the subject devices that the PE-PUR sound abatement foam degraded and released carcinogenic chemicals and volatile organic compounds which were unnecessarily transmitted into the lungs and bodies of users of the subject devices; and,

b. Failing to timely notify known purchasers, patients and/or consumers of the subject device that such purchasers, patients and/or consumers could be exposed to carcinogenic chemicals and volatile organic compounds.

208. Plaintiff and the Class were directly and proximately harmed by the defective warnings in the subject device as described above.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, prays for judgment against Defendants as to each and every count, including:

A. An order certifying this action and the Class requested herein as a class action, designating Plaintiff as the representative of the Class, and appointing Plaintiff's counsel as counsel to the Class;

B. An order declaring that Defendants are liable to Plaintiff and the Class and that Defendants' actions constitute: (i) breach of express warranty; (ii) breach of implied warranty of merchantability; (iii) fraudulent misrepresentation; (iv) fraud by omission; (v) negligent misrepresentation; (vi) strict liability – design defect; (vii) strict liability – failure to warn; (viii) strict liability – manufacturing defect; (ix) negligence – design defect; (x) negligence – manufacturing defect, and; (xi) negligence – warnings defect.

C.  A judgment awarding Plaintiff and members of the Class all appropriate damages in an amount to be determined at trial;

D.  A judgment awarding Plaintiff and the Class medical monitoring damages;

E.  A judgment awarding Plaintiff and the Class prejudgment and post-judgment interest, as permitted by law;

F.  A judgment awarding Plaintiff and the Class costs and fees, including attorneys' fees, as permitted by law; and

G.  A judgment granting any such other legal, equitable or further relief as the Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

**RESPECTFULLY SUBMITTED**, this the 22nd day of June, 2022.

BY:    ***/s/ Gregory E. Good***
         GREGORY E. GOOD (AZB # 014445)
         GOOD LAW, P.C.
         3430 E. Sunrise Drive, Suite 270
         Tucson, AZ 85718
         Telephone: (520) 628-8221
         Facsimile: (520) 547-0394
         Email: good@goodlaw.net


         JOHN M. DEAKLE (MSB # 6003)
         RONALD V. JOHNSON  (MSB # 105950)
         RUSSELL L. JOHNSON (MSB # 105560)
         RICHARD J. LAJAUNIE (MSB # 100035)
         DEAKLE-JOHNSON LAW FIRM, PLLC
         802 N. Main Street
         P.O. Box 2072
         Hattiesburg, MS  39403
         Telephone: (601) 544-0631
         Facsimile: (601) 544-0699
         Email: jmd@deaklelawfirm.com
         Email: rvjohnson@djlawms.com

Email: rljohnson@djlawms.com
Email: rjlajaunie@djlawms.com

Patrick W. Pendley (LAB # 10421)
Andrea Barient (LAB # 35643)
Pendley, Baudin & Coffin
24110 Eden Street
P.O. Drawer 71
Plaquemine, LA 70765
Telephone: (888) 725-2477
Facsimile: (225) 687-6398
Email:  pwpendley@pbclawfirm.com
Email:  abarient@pbclawfirm.com

*Counsel for Plaintiff*